## HODGDON *v.* BURLEIGH and others.

*(Circuit Court, D. Maine.* September, 1880.)

1. TAXATION—UNINHABITED TOWNSHIP—SEVERAL OWNERS—VALUATION—APPORTIONMENT—CONSTITUTION OF MAINE.—*Quære.* Whether an uninhabited township of land, situated in the state of Maine, and owned in severalty by different proprietors, was rightfully included in a tax act which made no provision for a valuation of the land of the different owners, and no apportionment of the tax, as required by the constitution of the state.

   *Clarke* v. *Strickland,* 2 Curt. 493.

2. SAME—DESCRIPTION OF WILD LANDS—USAGE.—A tax act of the state of Maine located certain wild lands in a specified county, and further described them as "No. 8, R. 3. do. do. do.," the words "do." being placed directly under the entry "W. of E. line of state." *Held,* that such description had acquired a well-known signification from a usage of more than 50 years, and was therefore sufficient.

3. SAME — PUBLIC AND PRIVATE PROPERTY — FORFEITURE. — *Quære.* Whether the lands of individual owners are forfeited for the non-payment of a tax, where such lands have been included with those of the state in a valuation and assessment for the purposes of taxation, but have been alone sold for the payment of the entire tax.

4. SAME—EQUITABLE INTEREST—LEGISLATIVE RESOLVE.—Under a resolve of the legislature of the state of Maine certain officers and soldiers of the revolutionary war were each entitled to receive a certain amount of land, to be assigned by draft, and were given certificates for the same. *Held,* that the legislative resolve vested in the holders of such certificates an interest in their respective lots, which, at the pleasure of the legislature, could be subjected to taxation.

5. SAME—UNCONDITIONAL DEED FROM STATE.—*Held, further,* that subsequent unconditional deeds from the state to the holders of such certificates, did not release said lots from taxes thus imposed.

6. SAME—FORFEITURE—SUBSEQUENT EXTENSION OF TIME OF PAYMENT.—Where lands have been forfeited to the state for the non-payment of a tax, and a subsequent act of the legislature has extended the time for the payment of such tax, the title to such lands under a tax sale must be established under the latter act.

   *Clarke* v. *Strickland,* 2 Curt. 493.

7. SAME—SALE—NOTICE.—A tax sale is void unless the notice of sale is duly published in accordance with the requirements of the statute.

8. SAME—SAME.—A tax sale is void unless all the taxes under which the sale is made are valid.

   *Elwell* v. *Shaw,* 1 Glf. 339.

9. SAME—SAME—CONVEYANCE.—A conveyance of "all the right, title, and interest of the state" in certain lands, by virtue of a forfeiture for the non-payment of taxes, is not authorized by a statute directing a sale and conveyance of such lands.

10. SAME—SAME—IRREGULARITIES—CURATIVE ACT.—Such irregularities cannot be cured by a subsequent act of the legislature, where the former owners still retain their title to the lands.

*Slocum* v. *City of Boston*, S. C. Mass. Oct. 1880.

11. SAME—SAME—FEDERAL COURTS—STATE COURTS.—It is the duty of the federal courts to follow the decisions of the state courts on state laws regulating proceedings in cases of tax sales.

*Raymond* v. *Longworth*, 14 How. 76, 78.

12. SAME—SAME—CONSTRUCTION.—Proceedings creating a forfeiture and sale of lands for the non-payment of taxes are to be strictly construed.

*Tolman* v. *Hobbs*, 68 Me. 316.

*Bradbury, Madigan & Webb,* for demandant.

*Albert W. Paine,* for tenants.

Fox, D. J. This is a writ of entry for the recovery of township No. 8, in the third range, west from the east line of the state, in the county of Aroostook, containing 23,040 acres. On the first day of the first term the respondents filed a disclaimer of certain specified lots, and pleaded the general issue as to the remainder, which disclaimer was accepted, and the pleadings joined and case submitted to the court for its decision. It is admitted that this township is, and always has been, a wild township, without inhabitants, and not taxable in any city, town, or organized plantation, and that no newspaper was published in Aroostook county prior to December, 1857. March 17, 1835, the legislature of Maine, by its resolve, declared that certain officers and soldiers of the revolutionary war, and widows of deceased officers and soldiers, should be entitled to receive 200 acres of land, to be selected from certain townships, one of which was letter D. The land agent was, by said resolve, directed to cause said townships to be surveyed into convenient lots of 200 acres each, and to execute a conveyance of one lot to each party who should prove his claims, to the satisfaction of the land agent, on or before March 4, 1838.

Before the survey, the parties who should establish their claims were entitled to a certificate, stating they were entitled to receive the 200 acres, which certificate was declared to be conclusive evidence of their right to receive the conveyance, in fee-simple, of one of said lots, whenever the same should be surveyed. By a resolve approved March 18, 1840, township No. 8, the subject-matter of the present suit, was appropriated, in lieu of letter D, to satisfy the holders of certificates for lots issued by the land agent under the former resolves. Where the holders had not selected lots and received their deeds, the land agent was required to have township No. 8 surveyed into lots of 200 acres, and to distribute the same by draft among the holders of such certificates. Commissioned officers and their widows were to receive 600 acres in three lots. Under this resolve the township was surveyed. A plan was made by Thomas Sawyer, Jr., and according to his plan and survey the whole township was divided into 108 lots, of about 200 acres each. Five of these lots were set apart for public uses. These lots are disclaimed by the tenants. All the lots in the township, except those reserved for public uses, were assigned by draft to the holders of the certificates, as provided in the resolves before referred to, and the record of the drawing of the lots was kept by the land agent in his office.

In the years 1841, 1845, and 1850, respectively, the legislature fixed the state valuation by resolves, which are *verbatim* with each other, and of which the following is a copy:

"*Resolved,* That the number of polls and amount of estates annexed to the several towns and plantations in the several counties, and the aggregate of the several counties in the foregoing schedule, be and the same are hereby established as the number of polls and valuation of estates, of taxable polls and estates of this state, until the further order of the legislature."

The schedule referred to in the resolves contained the following entry, which is the only entry claimed to be pertinent to this case, viz.: For 1841:

COUNTY OF AROOSTOOK.

＊      ＊.      ＊      ＊      ＊        ＊        ＊

wild lands in the county of Aroostook:

＊      ＊      ＊      ＊      ＊        ＊        ＊

| No. and Range. | Acres. | Value. |
|---|---|---|
| No. 8, R. 3, west from east line of state. | 23,040 | $4,000 |

The schedule for 1845 was the same, except that the value was $4,500.

And for 1850 was as follows:

| Description. | Acres. | Value. |
|---|---|---|
| 8, Range 3. | 22,040 | $4,500 |

Demandant also introduced the several acts assessing a tax on the state under said valuations for the several years, from 1841 to 1853, inclusive. The first section of each of said acts, and the only section preceding the schedules, is the same in all, and is as follows:

"Section 1. That each city, town, plantation, or other place hereinafter named, within the state, shall be assessed and pay the several sums with which they respectively stand charged."

In the schedules following the section the following entry is the only one alleged to refer to the matter in controversy. For 1841:

COUNTY OF AROOSTOOK.

＊      ＊      ＊      ＊      ＊        ＊        ＊

D. R. 2 W. of E. line of State.

＊      ＊      ＊      ＊      ＊        ＊        ＊

No. 8, R. 3, do. do. do., (eleven dollars sixty cents,)   $11 60

All the other years are essentially the same, except that the amount of tax varied in different years.

The demandant claims to have acquired a valid title to 93 lots, in this township, by reason of their having been forfeited for non-payment of state taxes, and subsequently deeded by the state to the demandant, or one McCrillis, whose title, it

is admitted, the demandant has acquired. The first deed was executed April 30, 1849, by Samuel Cony, land agent, and is as follows:

"To all persons to whom these presents may come: Samuel Cony, land agent for the state of Maine, sends greeting:

"Whereas, on the twenty-third day of March, A. D. 1849, Moses McDonald, treasurer of the state aforesaid, furnished said land agent with a list of all tracts and townships of land on which the taxes, costs, and interest had not all been paid, and which had by him been advertised, as provided in an act giving further time to redeem the lands forfeited to the state for the non-payment of taxes, and for the disposition of lands which may hereafter become forfeited, approved August 10, 1848, which list includes the tract of land hereinafter described, on which the sum of $218.37 appeared by said list to be due and unpaid for said taxes, costs, and interest.

"And, whereas, afterwards, on the thirteenth day of April, A. D. 1849, at 11 o'clock in the forenoon, at the land-office of the state, in Augusta, said land agent did sell said premises hereinafter described to William H. McCrillis, of Bangor, in the county of Penobscot and state of Maine, at auction, for the sum of $300, he being the highest bidder therefor, at that sum, said land agent having first given public notice of said time and place of sale by publishing such notice three weeks successively in the *Age*, being the state paper of said state of Maine:

"Now, know ye that I, Samuel Cony, in my said capacity, in consideration of the premises and of the payment of said sum of $300, the receipt of which is hereby acknowledged, do hereby sell and convey to him, the said McCrillis, his heirs and assigns, forever, all the right, title, and interest which the state of Maine has, by virtue of such forfeiture, in and to 15,026 acres of land in township No. 8, range 3, west from the east line of the state, in the county of Aroostook; to have and to hold the premises aforesaid, with all the privileges and appurtenances thereof, to him, the said McCrillis, his heirs and assigns, forever: *Provided, however*, that the

owners thereof shall have a right to redeem the same within one year from said time of sale, by paying to said purchaser or assigns the amount for which the same was sold as aforesaid, with interest thereon at the rate of 20 per cent. per annum, and the cost of reconveying the same.

"In witness whereof, I, the said Samuel Cony, in my said capacity, have hereunto set my hand and seal this thirteenth day of April, in the year one thousand eight hundred and forty-nine.      SAMUEL CONY. [L. S.]

"Signed, sealed, and delivered in presence of

     "WM. COULTER."

The next deed is from Cony, as land agent, to Hodgdon, is dated April 30, 1850, and is substantially like the former deed, reciting that the list of unpaid taxes was furnished by McDonald, as state treasurer, March 25, 1850; that the premises thereinafter described were sold April 30, 1850, at public auction, to Hodgdon; and that due notice was given of the time and place of sale by publishing the same three weeks successively in the state paper. The description of the estate conveyed is as follows: " 14,800 acres of land in township No. 8, in the third range, west from the east line of the state, it being the balance of said town returned to me by the treasurer as forfeited for the non-payment of taxes for the year 1845."

The third deed is from A. P. Morrill, land agent, to Hodgdon, dated April 30, 1851, and recites that the list of unpaid taxes for 1846 was furnished by the treasurer to the land agent, March 17, 1851. The sale was made April 30, 1851, and the land agent did thereby sell and convey to said Hodgdon all the right, title, and interest which the state of Maine had, by virtue of the forfeiture, in and to 700 acres of land in township No. 8, range 3.

The last deed was September 27, 1854, and was from the state treasurer to McCrillis, the law having been changed, so that the officer executed the conveyance instead of the land agent. It purported to convey the interest of the state in 4,340 acres in township numbered 8, range 3, the same being forfeited for non-payment of $29.19, including its proportion

of the state tax for 1849, '50, '51, '52, and '53, and of the county tax for the same years, certified to the treasurer according to law. The deed states that the notices were duly published in the papers according to statute requirements.

In *Clarke* v. *Strickland,* 2 Curtis, 493, the question was discussed whether an uninhabited township of land, owned in severalty by different proprietors, was rightfully included in a tax act which made no provision for a valuation of the land of the different owners, and no apportionment of the tax, as as is required by the constitution of Maine. For satisfactory reasons, there presented, the question was not then passed upon by the court. The same reasons exist in the present cause, and there will be no expression of any opinion upon that question.

The objection is strongly pressed by the tenants that no tax was laid on "township No. 8, in the third range," as it is said all the tax acts describe the estate taxed simply as "No. 8, R. 3," which is unintelligible. This is hardly a correct description of what appears in the tax acts, as, in the first place, the estate is always located in the county of Aroostook; and, secondly, the whole entry is "No. 8, R. 3, do. do. do."— these words "do." being placed directly under the entry "W. of E. line of state," thereby clearly declaring that "No. 8, R. 3," was situated in the county of Aroostook and west of the east line of the state. On reference to the tax acts, as far back as 1821, it will clearly appear that these "cabalistic letters and terms," to use the language of the learned counsel for the tenant, were then employed by the legislature in describing townships to be taxed; as, for instance, in fixing the taxes that year for Washington county, which then included the present county of Aroostook, there will be found the following entry: "County of Washington, No. 1, first range 9, 55-100;" "No. 6, 5, 72-100;" and the same course, it is believed, has been adopted in every tax act since that year. These "signs and cabalistic letters," from a usage of more than 50 years, have acquired a well-known signification, and there is not an individual in this state, who has ever had an interest in an acre of wild land, who, for an instant, could entertain a doubt

that "No. 8, R. 3," in the tax act, was intended to describe a township of that number in that range, and the letters and figures there found would be as intelligible to him, as easily understood by him, as if the entry had been written out at full length instead of being abbreviated.

Another objection to the taxes for every year (excepting three included in the last deed) is that they were laid on the entire township of 23,040 acres, and that, while the full tax was assessed on the 23,040, it was collected only from the owners of the 22,040, thereby exonerating the 1,000 acres of public lands; as, for instance, a tax of $11.60 assessed on this township in 1841 was laid on 23,040 acres, valued at $4,000, but the whole $11.60 was apparently collected from only the 22,040, including the portion sold for the non-payment of taxes.

Property belonging to the state is not ordinarily subject to taxation, but if the state, by its legislature, sees fit to include, in a valuation for the purposes of taxation, its own property, together with that belonging to individuals, and assesses thereon a tax, and afterwards collects the entire tax from the individual owners by a sale of their portion of the estate, as forfeited for the non-payment of the entire tax, it may be questionable whether the individual owner has thereby lost his estate; but, as there are other difficulties which, in the opinion of the court, are fatal to the title of the defendant, it is not necessary for the court to pass upon this objection.

In every year's taxes are included a large number of lots, the fee of which was then in the state, but the equitable interest thereto was in the holders of these certificates. It is claimed that these lots were not subject to taxation, but in the opinion of the court the legislative resolve vested in the holders of the certificates an interest in their respective lots, which, at the pleasure of the legislature, could be subjected to taxation, and this objection, therefore, is not sustained.

By chapter 723, Statutes of 1836, it was made the duty of the state treasurer to cause an assessment of a state tax on any township or tract of land not taxable by the assessors of any town or organized plantation, to be published in the

newspaper of the state printer three weeks successively. County taxes on such township or tract were to be certified by the county treasurer to the state treasurer, who was to credit the county with the amount. The owner of any tract so assessed for state or county tax, advertised as aforesaid by the treasurer, might, at any time within four years (afterwards increased to five) from passing the act of assessment, redeem the same from any state tax by paying the full amount of the tax, with 20 per cent. interest, after one year from date of assessment; and from any county tax, by paying the amount credited by the state treasurer to the county, with like interest, within four years from the date of such credit; and if not so paid it was provided "that said township or tract shall be wholly forfeited, and the title thereto shall vest in the state, free and quit from all claims by any former owner, and the same shall be held and owned by the state, by a title declared to be perfect and indefeasible." This act remained in force until August 1, 1841, when it was repealed by the Revised Statutes.

These provisions were substantially re-enacted by chapter 14 of the Revised Statutes of 1841, but the last publication was to be made by the state treasurer within three months from the day on which the assessment was made by the legislature. Some conflict is found between sections 8 and 9 of this chapter as to the time within which the payment was to be made by the land owner, but the same is of no importance in the decision of this case, as such payments were never made. The title which the state acquired by the forfeiture for the non-payment of the taxes was declared to be perfect and indefeasible, in the identical language used in the former act.

The tax for 1841 was laid under the act of 1836. Those for 1842 to 1846, inclusive, were laid under the Revised Statutes, and it appears that notice of the assessment of the state tax for these various years was each year duly published, in accordance with the requirements of law, with the exception of the year 1842, the notice for which year was inserted in only one week's issue of the state paper. No objection is

raised in argument by the learned counsel for the tenants to the form of the notices thus given. The court does not discover any defect therein, and by the non-payment of the taxes for all these years, excepting 1842, by the owners of said lots, within the time required, after legal notice, the state acquired "a perfect and indefeasible title thereto."

It is claimed by the tenants that, granting the taxes of 1841 and subsequent years were legally assessed, the conveyances subsequently executed by the land agent of various lots to the parties entitled thereto, had the effect to release those lots from the outstanding taxes; that when the state made an unconditional deed of a lot, it thereby released and conveyed all interest therein, and could not afterwards claim a forfeiture of a tax thereon previously assessed. Twenty-seven lots were conveyed prior to 1841, and a like number were conveyed that year; but the deeds were all executed previous to the passage of the act assessing the tax for that year. So that 54 lots were all conveyed to, and the legal title therein was held by, their individual owners when the tax of 1841 was assessed; but in each of these subsequent years, up to and including 1847, one or more lots were deeded by the land agent to the holders of the certificates. The land agent was not authorized by any act to release these lots from the encumbrances they were subjected to for taxes until said taxes had been paid, and, in the opinion of the court, the deeds as executed by him should be construed as passing to the grantees the interest which they were entitled to under the resolves granting these lots to the soldiers, and not as releasing the lots from any burden from which they had become subject for taxes subsequently imposed. To that extent only was the land agent authorized to make a conveyance.

On the tenth day of August, 1848, an act was passed, (chapter 65,) the title of which is "An act giving further time to redeem lands forfeited to the state for non-payment of taxes, and for the disposition of lands which may hereafter become forfeited." This is the act referred to in the first three deeds, under which demandant makes title to the premises, and requires a careful examination of its provisions in

order to determine whether the forfeiture incurred under the former acts was waived by the legislature in behalf of the land owners.

By the first section of this act the treasurer was required to advertise within 30 days, for six months, in six specified papers, a list of the forfeited tracts, specifying the amount of taxes due on each, and the time allowed by the act to pay the same. By the second section the owner could pay the amount at any time previous to the advertisement, or on or before the first day of March of each year after the lands were advertised. Under those sections the time for the payment of the taxes was extended, and a party was not obliged to pay until the advertisement had been pubiished as therein required. Before the treasurer could make to the land agent a return of the list, it was made a condition precedent that such list should have been so advertised; the language in section 3 being "that the treasurer shall furnish the land agent a list of all tracts or townships of lands, which have been advertised as provided in this act, on which the taxes have not all been paid," and the land agent shall, within 60 days, sell the same; that is, those tracts which have been thus duly advertised for non-payment of taxes. The owner might also redeem from the purchaser, within one year after the sale, by paying the amount for which the tract was sold, together with 20 per cent. interest, and was entitled to receive from the treasury any surplus of the purchase money which might there remain after payment of the taxes, etc., if called for within three years.

The question is made that the legislature might waive the forfeitures which had occurred by the non-payment of the taxes, and the inquiry is whether, by this act, it has not so done, and thereby restored to the original owners the right to redeem their estates under the provisions of this act. So that, if the purchaser would acquire a valid title, it must appear that the conditions of the act have been fully complied with.

In passing this act it is most manifest that the purpose of the legislature was to benefit the former owner, to forego any absolute title it might have acquired, and to recog-

nize in him a right of redemption, not only before the sale, but for one year thereafter; and, what is of great significance, if any surplus should remain of the purchase money over and beyond the amount due the state, the same should belong to the land owner. While the state held on to the lands until it was fully indemnified for its claims, it insisted on nothing more—all else was the owners'. Strict forfeiture was waived, both by the state's extension of the time for payment and by acknowledging the right of the owner to any balance which might remain in the treasury. The title of the act may well be referred to, to ascertain the purpose of the legislature. By that it is declared to be "An act giving further time to *redeem* lands forfeited to the state for the non-payment of taxes." Forfeiture and redemption cannot stand together. The moment a right to redeem was allowed, from that instant the forfeiture was at an end.

This extension of the time for the payment of the taxes should have the same legal effect as if it had been by an amendment of former acts, in terms declaring that thereby the time for the payment of the taxes was extended. If the legislature had adopted that course to accomplish its purpose, it could hardly admit of a question (whether the forfeiture had then attached or not) that by such extension of time the state had waived its title, and could acquire no title to the tract until after the time of extension had expired. As soon as chapter 65 took effect, the rights of the owners were restored to them. The legislature acknowledged them as having an interest in the property, as being its owners, subject to the lien of the state for the taxes due thereon, and by the act it provided very different provisions for depriving the owner of his estate on failure to pay the taxes.

If the land still continued the absolute property of the state, there would seem to be no propriety in the former owner having the power to call the state to an account for its disposal of the purchase money. If, on the contrary, the interest of the state was merely a lien for its taxes, then all that the state should require would be payment of its dues, and any surplus should enure to the owner's benefit.

The court, therefore, holds that, under the act of 1848, *c.* 65, the purchaser did not acquire an absolute title to the lands under previous laws, and, in order to sustain his title, the purchaser must show a compliance with the requirements of this chapter.

In the return made by the treasurer, to the land agent of the tracts advertised by him, he states that "the said tracts or townships had been advertised by him as forfeited lands." It is sufficient to remark that this certificate of the treasurer does not show any compliance by him with the requirements of the act. It may all be true to the very letter, and yet the notice not have been published in a single paper mentioned in the act. A single advertisement, in any paper in the state, would justify this certificate of the treasurer.

The papers introduced in evidence do not prove that notice was given as required. The first notice bears date September 8, 1848, and recites that the several townships and tracts of land mentioned in the following schedule have become forfeited, either in whole or in part, for the non-payment of the amount of taxes specified against each tract or township. The schedule is as follows: "No. 8, R. 3, W. E. L. 102.39."

The number of acres on which the tax remained unpaid is nowhere stated in the notice, but the statement is of a most uncertain character, affording the owners but little information as to the property claimed to be forfeited, the allegation being " that the township, either in whole or in part," had become forfeited for taxes; but whether the whole or a part, and what part, was forfeited, is nowhere averred. The amount of tax stated in the notice as remaining unpaid is also different from that found in the treasurer's return of March 23, 1849, in which he gives the amount of the state and county taxes unpaid for each of the years 1841, '42, '43, '44, amounting, in the aggregate, to $100.94. In the opinion of the court, this notice was erroneous in both of these particulars: the number of acres of land on which the taxes were unpaid should have been truly stated, and also the amount of taxes remaining unpaid. If these objections are not valid, there is another still remaining, which renders the notice wholly inop-

erative. The advertisement should have been inserted each week for six months in six papers designated by the act; this was not done. In the *Kennebec Journal* there appear to have been but two insertions of the advertisement in each of the months of October, December, January, and February. There is no evidence of the notice having been published in the *Portland Advertiser* after October, and some omissions are found in the publications in the *Eastern Argus,* as well as in the two papers printed in Bangor. Unless the notice required by the statute was duly published in conformity to its requirements, the treasurer had no authority to certify a list of unpaid taxes to the land agent, and he was without authority to sell the same and give a good title to the purchaser.

The treasurer returned to the land agent that the taxes, both state and county, amounting to $100.94, were unpaid on 15,026 acres of land in this township for the years 1841 to 1844, inclusive, and that officer proceeded to advertise and sell that number of acres, and no more. The ledger of the state treasurer states by whom the taxes were paid for each year, but does not always give the numbers of the lots upon which they were paid. The taxes for the years 1841 and 1842 were frequently paid by the owners in subsequent years, and on referring to the ledger entries for those years it appears for which lots the taxes were thus paid by these parties for previous years, We can thus ascertain for which lots the payments were made during these four years. It appears from the ledger that the taxes for 1841 were paid upon 7,017 acres, in which were twice included lot 61, the tax upon which was paid for that year by both Cotton Lincoln and J. C. Chase, and also lot 60, the tax upon which was also paid by both True Green and J. P. Martin. These two lots, containing 400 acres, were thus duplicated in ascertaining the number of acres upon which the owners had paid the taxes. The 7,017 acres, therefore, should be reduced to this extent, leaving the taxes paid only upon 6,617 acres, and unpaid on 15,423. The state treasurer's return of the number of unpaid acres was, therefore, erroneous. Instead of 15,026 acres to be sold for taxes, there were 15,423, and the

land agent had no authority to sell and convey the smaller number in discharge of the taxes remaining unpaid, thereby leaving over 400 acres exonerated from taxes by the sale of the property of others, in which the owners of the 400 acres are not shown to have been interested.

No law can be found which would authorize such proceedings. The property was held in severalty. Every lot was proportionately encumbered by the tax according to the number of acres it contained, and the 15,423 acres were chargeable with the whole of the unpaid tax; but the result is that the 15,026 acres have thus been made to pay the tax upon the 15,423 acres, and one man's debt has thus been paid compulsorily from another's property, and for which no redress is provided.

The treasurer, in his notice, required of the owners the payment of both state and county taxes, giving the whole amount of the unpaid taxes ($102.96) without discriminating between them; and in his return to the land agent, after specifying the amount due for each year to both state and county, he aggregates them at $100.94, and the land was sold for the payment of this amount, with interest and cost. It was conceded the county taxes were illegal for all but one year, the amount assessed having been in excess of that authorized by the legislature, and there is no evidence in support of the county tax for that year, so that none of the county taxes are shown to have been duly assessed; but the treasurer and land agent have always recognized the county taxes as of the same validity as the state taxes, have always claimed them in their advertisements, have demanded their payment from the owners, have finally sold the property on account of their non-payment, and retained their amount from the sale of the property, and the owner could only redeem his estate by payment of the amount for which the estate was sold.

If the state undertakes to sell the property of a citizen for unpaid taxes, all the taxes for which the sale is made must be valid and legal; if not so, no title is acquired by the purchaser. Such was the decision of the supreme court of this

state in 1 Glf. 339, (*Elwell* v. *Shaw,*) and it has ever since been recognized by the courts.

Most, if not all, of these objections are alike applicable to the first three deeds under which the demandant claims. Fourteen thousand eight hundred acres were returned to the land agent by the state treasurer for unpaid taxes of 1845, and that number was advertised and sold in 1850. Seven thousand two hundred and seven were entered on the treasurer's ledger as paid, but 600 acres are duplicated by the taxes on the same lots having been paid by both Barnes and W. E. Edwards, so that in fact taxes were paid only on 6,607 acres, leaving 15,433 unpaid, while only 14,800 were returned unpaid and sold.

So, for tax of 1846, 21,207 acres appear to have been paid for by the ledger of the treasurer, and only 700 acres were returned forfeited and sold for taxes; in fact, there were 1,433 acres on which taxes for that year were not paid to the treasurer. The title of the demandant, under the deeds of 1850 and 1851, is subject to nearly all the objections which arise as to his title under the deed of 1849, and in the opinion of the court he did not acquire a valid title under either of said conveyances.

By act of 1854 the treasurer was to sell and convey forfeited lands, and by his deed of September 27, 1854, he undertook to convey "all the right, title, and interest of the state in 4,340 acres, by virtue of a forfeiture for non-payment of its proportion of state and county taxes for the years 1849 to 1853, inclusive, in this township." This deed is invalid for various reasons: the sale was for both state and county taxes for each of these years, and there is no evidence of any valid county tax having been assessed; the land was not forfeited, at time of sale, for taxes for 1853, as the owner had a right of redemption for two years after the assessment, and, by the act of 1854, the treasurer could only dispose of lands after forfeiture; the number of acres of forfeited lands was not correctly stated, there being 4,740 acres on which the taxes were unpaid, including the

year 1853, instead of 4,340, the quantity advertised and sold; the land itself was not conveyed, but only the right, title, and interest of the state. For these reasons, in the opinion of the court, the deed of 1854 was invalid.

Some of the objections which have thus been considered have heretofore been presented to this court, and determined in accordance with this opinion. The opinion found in 2 Curtis (*Clarke* v. *Strickland*, 493) was drawn by Judge Ware, but it was, without doubt, sanctioned and approved by Judge Curtis, as the same was reported by him without comment or dissent. It was then decided that if a tax was legal, and the land forfeited for non-payment, a subsequent act of the legislature, giving further time for payment of the tax, was a waiver of the forfeiture, at least so far that the title under a tax sale must be made under this law. If the county commissioners, in levying a tax, assess a larger sum than is granted by the legislature, it renders the whole tax void. When the treasurer, in his advertisement, gave as the sum due the whole amount, including the county tax, it was a fatal defect in the proceedings,—the county tax, being illegal, was not due. . When the land agent was directed by the statute to sell the land, and he sold all the right, title, and interest of the state, such a sale was not in accordance with the statute.

By three of these deeds, "the sale was only of the right, title, and interest of the state." The other deed purports to convey 14,800 acres, but the advertisement only offered for sale "the right, title, and interest of the state in that number of acres," and for this cause all of these conveyances are deemed invalid.

In *Clarke* v. *Strickland* it was also decided "that if a tax was legal, and the land forfeited for its non-payment, the forfeiture was waived by the levy of another tax after the title of the state had become perfect under the forfeiture." If this principle is correct, it would invalidate the title of the demandant to the larger portion of the township.

The demandant claims that by the act of April 23, 1852, (chapter 172,) these deeds vested in the grantees a valid

title, "notwithstanding any irregularities in the notices, or failures to comply with the provisions of the acts under which the sales were made." Three of the deeds were executed before the passage of this act. Admitting that the state might waive any rights it might have to insist on such irregularities, it cannot be that, by such action on its part, it can divest the title which the owners had at the date of the passage of the act. If these conveyances were invalid, by reason of these defects, and the owners still retained the title to their lands, the legislature could not, by any act it might pass, deprive them of their property. So far as the interests of the owners were involved, the act was null and void.

The supreme court of Massachusetts, in *Slocum* v. *City of Boston,* October, 1880, Suffolk county, have passed upon an act of the legislature of that state similar to that now under consideration and adjudged it to be unconstitutional. That court had previously decided that certain advertisements of the collector of Boston, of sales of lands for taxes, were not in conformity with the requirements of the statutes. Thereupon, in 1878, the legislature passed an act "that no sale of land for taxes heretofore made should be held invalid by reason of such defect in the advertisements," and the validity of this latter act was the question before the court in *Slocum's Case.* Such legislation did not receive the sanction of that court; by it an owner was not deprived of his estate; the sale was still invalid, notwithstanding the legislature's attempt to remedy the defect; and this decision is an express authority against the validity of chapter 172, so far as the title of the owners of the lots is involved. The last deed was executed subsequent to the passage of the act, but most of the objections which are sustained by the court are alike applicable to all the deeds, and are not dependent on irregularities in the notice, or failures to comply with the provisions of the acts under which the sales were made.

In *Raymond* v. *Longworth,* 14 How. 76, 78, the supreme court lay down the rule "that it is the duty of the federal courts to follow the decisions of the state courts on state laws regulating proceedings in cases of tax sales."

And the supreme court of Maine, in *Tolman v. Hobbs*, 68 Maine, 316, say: "It is claimed that the land in dispute was forfeited to the state for non-payment of taxes, and then sold by the state to the demandant. The proceedings creating such a forfeiture and sale are to be strictly construed."

In that case the tax title was defeated because it did not appear that the treasurer complied with the law regulating the publication of the list of lands to be sold.

This decision fully sustains the conclusions at which the court has arrived in the present case. By chapter 6 of Revised Statutes, which were in force when the proceedings in that case took place, the land became forfeited to the state if the taxes were not paid within two years of the assessment, and when forfeited the treasurer was required to sell the same, after giving the notices prescribed. Chapter 172 of act of 1852 is found to be substantially re-enacted by section 58, *c.* 6, Rev. St. By this decision an owner of land, after the alleged forfeiture was incurred, and the land sold by the treasurer, was declared as still having an interest in the estate; that he could stand upon and claim the property, unless the purchaser proved a full compliance with the tax acts, and there was nothing in the act of 1852, or section 58, of *c.* 6, which debarred him from relying on his former title.

On page 23 of the argument for the demandant it is admitted that he must, in an action like the present, rely on his own title, and in the opinion of the court it is fatally defective in many respects.

Judgment for tenants for all the lots not disclaimed by them, with costs.