DEFORREST KEYES, In Equity *vs.* STATE OF MAINE.

Kennebec.    Opinion May 15, 1922.

*In case of the sale of real estate by the State for non-payment of taxes in order for the interest of the State to pass under the deed, it must purport to convey the State's interest in the townships or tracts of land assessed, and not purport to convey the State's interest in a certain number of acres in a certain township, without locating the acreage.*

The rule is settled in this State that in the absence of statute a grantee in a tax deed, if the title proves defective, cannot maintain an action against a municipality to recover the consideration paid. If the deed contains covenants by the collector that the proceedings antecedent to the sale have been according to law, the purchaser in case of failure of title from any such cause must look to the covenanter, not to the city or town. This general rule, as above stated, applicable to municipalities, applies to the State.

This rule of "caveat emptor" applies to a failure of title by reason of facts antecedent to the tax purchase, of which the purchaser has or can obtain full knowledge; he receives such a conveyance as he expected to obtain. In such a case he cannot without proof of some fraudulent representation of concealment recover back the consideration paid; and such recovery can only be from a party to the fraud.

If the number of acres is a part of the description, it must yield to, and cannot control the more comprehensive and definite description of the townships or tracts, following the tax acts.

The State's interest under the assessment was not released on any part of any township or tract assessed, involved in this case.

The notices of sale issued by the treasurer of state, in the instant case, must be held to have offered for sale the State's interest in the several tracts, as described in the tax acts.

The State entered into a contract with the plaintiff to convey to him for a specified consideration all the interest in certain lands that it had a right to convey; this it did not do, and has allowed nearly twenty years to pass without doing it, notwithstanding the matter has been biennially before the Legislature. This is an unreasonable delay. Under the same circumstances one private individual would be entitled to recover against another, and for the purposes of this case the State, having waived its immunity to suit, is to be treated as any other suitor, corporate or individual.

The State cannot, under the circumstances disclosed by this case, in good conscience retain the money which the plaintiff paid into the State Treasury, for which the Legislature has declared that he received no consideration.

On report.    This is a bill in equity brought pursuant to Chapter 80 of the Resolves of the State of Maine for the year of 1919, by Deforrest Keyes of Oneonta in the State of New York praying that from the State Treasury there be paid to him the amount he paid in 1902 for certain tracts of land which had been advertised by the State Treasurer as having been forfeited to the State for state taxes and county taxes, said tracts having been sold at public auction, and interest on the same.    The cause was heard by a single Justice on bill, answer including demurrer and proof, and reported.    Bill sustained.

The case is fully stated in the opinion.

*George C. Wing, George C. Wing, Jr. and Charles J. Staples of Buffalo, New York,* for plaintiff.

*Guy A. Sturgis, Attorney General,* for the State.

SITTING:  SPEAR, HANSON, DUNN, MORRILL, DEASY, JJ.

MORRILL, J.  This cause is before the court by authority of a resolve of the Legislature of the State, approved March 27, 1919, by which the State of Maine waived its immunity from suit and imposed upon this court the duty of determining "on its merits without regard to defenses by statute," what amount, if any, is due from the State to said plaintiff "under the principles of the common law or the principles of equity."  Resolve of 1919, Chapter 80.  In this resolve the statement appears, without qualification, that the plaintiff has paid into the Treasury of the State of Maine the sums of seventeen thousand eight hundred and ninety dollars and twenty-four cents, and four hundred and fifty-five dollars and ninety-nine cents, "for which sums the said Deforrest Keyes received no consideration."

To fully understand the circumstances which actuated the Legislature in enacting this resolve, and the precise questions submitted for our decision, it will be profitable to review concisely the transactions between the plaintiff and the State of Maine.

On March 7, 1902, the plaintiff, a young man then about twenty-four years of age, a resident of Oneonta, New York, addressed a letter to "Comptroller State of Maine, Bangor, Maine," inquiring

"when the next sale of lands in your state for delinquent taxes takes place." This letter of inquiry found its way to the office of the Treasurer of State and on March 10, 1902 a clerk in that office replied as follows:

"March 10, 1902.

D. F. KEYES, Esq.,
    Oneonta, N. Y.

Dear Sir:—

Replying to your favor of March 7th inst. have to inform you that the next sale of lands in this State for non-payment of taxes will be held the latter part of September.

I have entered your name on my mailing list and will send you a list of the lands to be sold a few weeks previous to sale.

Should you wish to make any purchase it will not be necessary for you to be present. You can inform me what tracts you desire to bid on and I will make your bids for you. Usually the lands are sold at figure stated in printed list.

Yours truly,

ORAMANDAL SMITH, State Treasurer. W."

During the summer of 1902 the Treasurer of State gave notice according to law of the annual sale of lands lying in unincorporated townships, forfeited to the State for state taxes and county taxes, certified to the Treasurer of State for the year 1900, and on or about August 1, 1902 a copy of such notice was mailed to the plaintiff from the Treasurer's office. The date fixed for the sale was September 24, 1902. The notice contained three hundred sixty-seven items of taxes in default for various years; of these taxes in default only forty-seven items were for taxes certified for the year 1900; to make this statement more intelligible, without copying the whole schedule:— Township A, Range 2, West of the East line of the State, in Aroostook County, appears ten times for taxes in default from 1891 to 1900 both inclusive; Township 8, Range 5, West of the East line of the State, in Aroostook County, appears seventeen times for taxes in default certified in years between 1881 and 1900 both inclusive; Township 16, Range 7, Eagle Lake Plantation, in Aroostook County,

appears fourteen times for taxes certified from 1881 to 1894 both inclusive; Fryeburg Academy Grant, in Oxford County, appears sixteen times for taxes certified from 1885 to 1900 consecutively. These instances are typical of the items scheduled in the notice in the eight counties in which the lands lie.

After receipt of this notice the plaintiff wrote the Treasurer of State as follows:

"Oneonta, N. Y., Aug. 20, 1902.

ORAMANDAL SMITH, State Treasurer,
    Augusta, State of Maine.

Hon. Sir:—

On Aug. 1st I received from your department a list of the lands that would be sold for taxes Sept. 24, for which please accept my thanks.

I now desire to secure a good sized map of the State of Maine showing sections and lots and not knowing where to secure same I write you thinking perhaps you may have one you could send me as I am going to bid on some lots during your sale and would like to look up the location of same. Would be perfectly willing to pay you for same. I suppose there is never any postponements of tax sales to later date, if there should be would be pleased if you would inform me as I intend taking a trip to Maine the latter part of Sept.

Very truly yours,

D. F. KEYES."

To this letter a clerk in the treasurer's office replied as follows:

"August 22, 1902.

D. F. KEYES, Esq.,
    Oneonta, N. Y.

Dear Sir:—

In compliance with your request of the 20th inst., I herewith enclose you map of the State of Maine showing townships.

The land sale is always held on date advertised. Should you find it impossible for you to be present you may authorize me to bid for you, stating townships you wish to purchase and highest amount you desire to pay. In most all cases the land is sold for amount given in schedule.

Yours very truly,

ORAMANDAL SMITH, State Treasurer, W."

On the day before the date fixed for the sale, the plaintiff called at the Treasury and had conversation with one Wiswell, the clerk who had replied to his letters; Wiswell testifies that he explained to him the "system of taxation,—that the taxes weren't levied against the individual owners, but against the township as a whole, and at the end of two years all the acreage remaining unpaid was advertised to be sold at auction." On the day of the sale the plaintiff came to the Treasury and in the course of conversation was told by Wiswell, according to the latter's testimony, "that there never had been a case decided in our law courts in favor of the purchaser of these lands." This testimony, if material, should be weighed with much care in view of Wiswell's statements in above letters that Keyes's presence at the sale was not necessary and that his bids would be made for him, and in view of his further testimony that to his knowledge no written word was ever given the plaintiff by anybody in the State Treasurer's office questioning the validity of a state tax deed, and that the first time he discussed in reference to this Keyes matter any possibility of defect in title was when Keyes's attorney called at the treasury in 1904 or thereabouts.

The State introduces against objection the stenographic report of the testimony of the treasurer, Mr. Oramandal Smith, before the Committee on the Judiciary of the Legislature of 1905, to the effect that he said to Mr. Keyes: "Mr. Keyes, the State does not stand behind these titles and every one of them may be contested and brought into our courts, and you will be subject to the decision of the courts." If it became necessary to pass upon the admissibility of this evidence, Mr. Smith being dead, we are inclined to regard it as inadmissible, not being under oath; but in the view which we take of the case, the conversations of Mr. Wiswell and Mr. Smith with the

plaintiff on the day of the sale are immaterial; the latter's rights do not depend upon whether he was or was not warned of the possible invalidity of titles under the sale.

The sale was held on September 24, 1902 according to the notice, and the plaintiff bid on, and became the purchaser of, three hundred and one items, and later, about October 15, 1902 received by express three hundred and one deeds. An examination of these deeds shows that only twelve are for sales for taxes certified for the year 1900, and that the entire number relate to only thirty-eight different townships; in other words the State's interest in a single township was sold several times; to make clearer the result of such examination of the deeds, certain typical instances may be taken—the State's interest in Township A, Range 2, West of the East line of the State, purported to be conveyed in ten deeds, one for each year, from 1891 to 1900 both inclusive, specifying in each of eight deeds, on account of taxes for 1891 to 1898, that such interest is in 597 acres, and in the other two deeds, 1899 and 1900, in 598 acres; the State's interest in Township E, Range 2, West of the East line of the State purported to be conveyed in thirteen deeds, one for each year from 1887 to 1899 both inclusive, specifying that such interest is in 1674 acres for 1887 and 1888, 1074 acres for 1889 and 1890, 1337 acres for 1891-1896, and 1333 acres for 1897-1899; the State's interest in Township 17, Range 8, West of the East line of the State, known as St. John Plantation, purported to be conveyed in fourteen deeds, one for each year from 1881 to 1894 both inclusive, specifying that such interest is in 1537 acres for 1881-1883, 1534 acres for 1884, 1537 acres for 1885 and 1886, 1787 acres for 1887, 1662 acres for 1888-1890, 2184 acres for 1891, 2363 acres for 1892, 2778 acres for 1893, and 1147 acres for 1894; the townships above named are in Aroostook County. One more illustration from another county will suffice to make clear the procedure of the Treasury officials; the State's interest in the well-known township in Oxford County, known as Fryeburg Academy Grant, purported to be conveyed in sixteen deeds, one for each year from 1885 to 1900 both inclusive, specifying that such interest is in 1231 acres for 1885, 1131 acres for 1886, 1064 acres for 1887 and 1888, 1265 acres for 1889 and 1890, 1124 acres for 1891, 1129 acres for 1892, 1227 acres for 1893, 2036 acres for 1894, 4289 acres for 1895, 4297 acres for 1896, 4370 acres for 1897 and 1898, and 4510 acres for 1899 and 1900.

For the State's interest which these three hundred and one deeds purported to convey the plaintiff paid $17,890.24; he also paid $301 for the deeds, for which there is no warrant of law; this sum was divided among the office force who made the deeds.

Not one of these deeds was effective to convey the State's interest in any tract of land, not because the township in *some* deeds was described as in the deed printed in the record, selected as typical, "A2 Range 13 and 14 W. E. L. S." in Piscataquis County, or as "A Range 2, W. E. L. S." in Aroostook County, or as "6 Range 3, N. B. P. P." in Penobscot County, or as "5 Range 9, N. W. P." in Piscataquis County, or as "1 Range 4, E. K. R." in Somerset County, but because *every* deed purported to convey the State's interest in a certain number of acres in a certain township, without locating the acreage, as in the sample deed printed in the record, "the following described parcel of land so forfeited, situate in the county of Piscataquis, viz.: 858 acres in A2 Range 13 and 14, W. E. L. S." Such descriptions are insufficient to pass the State's interest in any particular parcel of land. · *Moulton* v. *Egery*, 75 Maine, 485; *Bank* v. *Parsons*, 86 Maine, 514; *Millett* v. *Mullen*, 95 Maine, 400, 412; they do not even create any doubt or cast any cloud on the owner's title. *Powers* v. *Sawyer*, 100 Maine, 536, 542.

The following year on September 24, 1903 the plaintiff again attended the sale of lands lying in unincorporated townships forfeited to the State for state taxes and county taxes, certified to the Treasurer of State for the year 1901, and bid off fifteen items of which twelve are for sales for taxes certified for the year 1901.

For the State's interest which these fifteen deeds purported to convey the plaintiff paid $455.99, and for the deeds $15.

Each of these deeds is insufficient to pass the State's interest in any particular parcel of land for the same reason applicable to the deeds of the preceding year.

In 1903 after the rights of redemption from the first sale had expired an attorney for plaintiff came to Maine for the purpose of locating his client's lands, and then for the first time learned of the utter worthlessness of these deeds. Again in 1904 another attorney came to Maine and in conversation with the Treasurer of State, attempted to have the deeds corrected, with no result except a reference of the matter by the Treasurer to the Attorney General for his opinion.

In 1905 application was made in behalf of the plaintiff to the Legislature for reimbursement of the sums paid as above stated. The application met with an adverse report from the committee. In 1907 a similar application met the same fate. ·

In 1909 a resolve in favor of the plaintiff authorizing the payment of $18,166.03 was vetoed by Governor Fernald in a brief message which stated: "The legal or equitable obligation of the State, if any exist, to acknowledge the claim made by Mr. Keyes is surrounded by much uncertainty and difference of opinion and until that uncertainty can be removed and those differences of opinion can be better harmonized I must respectfully decline to sign the resolve." See Laws of 1909, Page 1453. This veto message did not discuss the merits of the claim.

In 1911 and 1913 resolves in behalf of the plaintiff were favorably reported from committee, but indefinitely postponed by the Legislature.

In 1915 a resolve authorizing Mr. Keyes to bring suit against the State was indefinitely postponed.

In 1917 the Legislature accepted an adverse report, and in 1919 the resolve by which these proceedings were authorized, was passed.

Such is the history of the controversy now before us for adjudication. The action of the Legislature by the resolve of 1919, while not unprecedented, is unusual and designed to meet unusual conditions. In this connection we quote from a message by Governor Milliken, dated March 20, 1919, seven days before approval of the resolve under which we are acting, vetoing a similar resolve in favor of one Burns: "The State's immunity from being sued by an individual is an attribute of sovereignty and should be waived only upon rare occasions when there is urgent and conclusive evidence that only by such extraordinary means can the ends of justice be served." It is undoubtedly true, as contended by the Attorney General, that in consenting to be sued the State has not admitted any liability to the plaintiff or created any cause of action which did not previously exist. It has waived its immunity from suit, and has consented that the court may "determine on its merits without regard to defenses by statute what amount, if any, is due on said claim under the principles of common law or the principles of equity." Immunity from action is one thing; immunity from liability is another; the State has waived the former, but has submitted its liability to the determination of the court upon the merits of the case regardless of defenses by statute.

At the beginning of the inquiry we must recognize the rule as settled in this State that in the absence of statute a grantee in a tax deed, if the title proves defective, cannot maintain an action against the municipality to recover the consideration paid.  If the deed contains covenants by the collector that the proceedings antecedent to the sale have been according to law, the purchaser in case of failure of title from any such cause must look to the covenantor, not to the city or town.  *Treat* v. *Orono*, 26 Maine, 216; *Packard* v. *New Limerick*, 34 Maine, 266; *Arnold* v. *Augusta*, 118 Maine, 399; *Lynde* v. *Melrose*, 10 Allen, 49.  The same rule applies as to a county in case of a sale by a sheriff for non-payment of a tax assessed for building a road.  *Emerson* v. *County of Washington*, 9 Maine, 88; *Pennock* v. *Douglass County*, 39 Neb., 293.  In a note to the case last cited printed in 42 Am. St. Rep., 588 it is said that the principle also applies to all tax sales "whether made for the benefit of a town, city, county, or state."  While we have not seen a case arising upon a tax sale by a state officer similar to the sale in question, the reasons given by text-book writers and courts in reported cases apply to such a case and we perceive no ground for excluding the instant case from the general rule.  In Michigan a statute authorized the refund of bids in certain cases where the titles proved defective on account of facts antecedent to the sale, but the right to a refund was strictly limited by the statute.  *People* v. *Auditor General*, 30 Mich., 12.  It was conceded by counsel in that case that the auditor general could only act in accordance with positive law, and could not refund any moneys upon the failure of tax titles except as some statute requires it.  "The state does not guarantee tax titles, except as statutes may provide for it.  In all other cases the purchaser must be content with such interests as he gets under his tax purchase;" Campbell, J.  We therefore, hold that the general rule as above stated, applicable to municipalities, applies to the state.  Nor is the plaintiff better off in equity.  Per Appleton C. J., in *Stewart* v. *Crosby*, 50 Maine, 137. *Abbott* v. *Allen*, 2 Johns, Ch. 523 and note in Law Ed., Page 472. But this rule of "caveat emptor" applies to failure of title by reason of facts antecedent to the tax purchase of which the purchaser has or can obtain full knowledge; he receives such a conveyance as he expected to obtain.  In such a case he cannot without proof of some fraudulent representation or concealment, recover back the consideration paid; and such recovery can only be from a party to the fraud.  *Treat* v. *Orono*, 26 Maine, 217, 220.

It is proper to remark at this point that the purchaser at a tax sale should not, in any proceeding to test or touching the validity of such sale be regarded with suspicion, or put at a disadvantage merely because he is such purchaser. The State has adopted the policy of enforcing payment of taxes by sales of the property upon which taxes are delinquent; to stimulate interest in such sales it holds out the inducement of large profits. As was said in *Packard* v. *New Limerick*, supra: "The risk respecting the title and proceedings rests upon the collector and purchaser. When the purchaser acquires a good title, he is compensated for his risk, by being allowed at the rate of twenty per cent for the use of his money, if the lands are redeemed, and if they are not, by becoming the owner of the lands, usually, for a small part of their value. When the title does not prove to be good, he may be subjected to a loss of the amount paid for it. The town assumes no part of the risk, and does not become responsible for the goodness of the title conveyed to the purchaser who must rely on the covenants contained in the deed of the collector."

In the view which we take of this case the decision does not depend upon the application or non-application of this rule of "caveat emptor." Counsel for both plaintiff and the State have, however, argued the case from that standpoint. A decision of the case does, however, involve an examination of the entire procedure in the assessment of state taxes and the sale of lands to enforce payment of such taxes in arrears, and as the arguments of counsel lead to such examination, we have considered their respective contentions. It is of the greatest importance to the State that the correct procedure leading to such sales should be outlined, so far as involved in this case, even at the expense of an extended opinion. Sales to enforce payment of taxes in arrears should be effective, and deeds given under such sales should convey the State's interest in the lands taxed.

The counsel for plaintiff contend that the rule of immunity from liability of municipalities, counties and states, upon failure of tax titles, above recognized, does not apply where there has been fraud, circumvention and concealment; they rely in support of this contention upon certain expressions to be found in *Treat* v. *Orono*, supra, *Stewart* v. *Crosby*, supra, and *Emerson* v. *County of Washington*, supra. We need not consider whether, in such case, the consideration could be recovered from the State, or only from a party to the fraud. *Treat* v. *Orono*, supra, at Page 220; we will examine the facts upon

which counsel rely to establish fraud. They maintain that the notices of sale issued by the Treasurer of State for sales of land forfeited to the State for state taxes and county taxes, certified to the Treasurer of State for the years 1900 and 1901, were representations by the State upon which a prospective bidder had a right to rely, and that the plaintiff did rely thereon.

They maintain in their brief "that the advertisement of the State was constructively fraudulent because—

(a) The lands were not sufficiently described as required by statute.

(b) That the taxes were not lawfully assessed because not lawfully described.

(c) That lands were described which did not exist.

(d) That in fact there had been no forfeiture whatever as advertised by the State of Maine."

In summarizing their argument, they say: "The entire proceedings, ab initio, are void. There were no taxes levied. No lands, no interests were forfeited, nothing was sold, nothing was conveyed. The transaction was a nullity. This big mistake arose out of the misstatement by the State as to essential facts,—misrepresentations which have worked at least constructive fraud upon Deforrest Keyes."

This contention calls for an examination of the assessment of state taxes for the years 1878-1901 both inclusive; these taxes were assessed by the Legislature of the State, R. S. 1883, Chap. 6, Sec. 69 as amended by Laws of 1895, Chapter 56. An examination of the various tax acts for those years fails to show any illegality or irregularity in the assessments on the lands in which the plaintiff is interested. The lists which make up a part of section one of these acts are in three columns, the first containing a description of the tract taxed, the second, the amount of the tax in words, the third, the amount of the tax in figures. There is no statement of valuation or acreage. Prior to the creation of the Board of State Assessors in 1891 the state valuation was made by the Legislature; since that date the duty of making the valuation of the State has been imposed upon that board. Their duties in respect thereto were first defined by Public Laws 1891, Chapter 103.

Section seven directs them to make an annual report to the governor and council, "and for the years in which they shall equalize the

valuation of the state, their report shall include tabular statements of the state valuation."

Section eight constitutes the State Assessors a State Board of Equalization and directs them to perform the duties theretofore devolving upon the Legislature in apportioning the state tax among the several towns of the State.

Section eleven provides that a "statement of the amount of the assessed valuation for each town, township and lot or parcel of land not included in any township, after adjustment as provided by section thirteen, the aggregate amount for each county, and for the entire state as fixed by the board of equalization, shall be certified by said board and deposited in the office of the secretary of state as soon as completed, and before the first day of December preceding the regular sessions of the legislature. The valuation thus determined shall be the basis for the computation and apportionment of the state and county taxes, until the next biennial assessment and equalization."

By Section fifteen as amended by Public Laws 1893, Chap. 291, Sec. 1, the land agent was directed to furnish the State Assessors with full and accurate lists of all townships or parts of townships or lots or parcels of wild lands in the State, and all information in his possession touching the value and description of wild lands; and all other state officers are directed to furnish, when requested, like information touching said valuation. The section further provides:

"In fixing the valuation of unorganized townships, whenever practicable, the lands and other property therein, of any owner's may be valued and assessed separately. All owners of wild lands or of rights of timber and grass on public lots, shall either in person or by authorized agent, appear before the board of state assessors at times and places of holding sessions in the counties where said lands are located, or at any regular meeting of the board held elsewhere on or before the first day of August of each year preceding the regular legislative session of this state; and render unto them a list of all wild lands thus owned, either in common or severalty, giving the township, number, range and county where located, part owned and an estimate of its fair value; and answer such questions or interrogatories as said board may deem necessary in order to obtain a full knowledge of the just value of said lands. Owners of less than five hundred acres of such lands in any township shall be exempted from the provisions of this section."

R. S., 1883, Chap. 6, Sec. 69 as amended by Public Laws 1895, Chapter 56, provides:

"Lands not exempt, and not liable to be assessed in any town, may be taxed by the legislature for a just proportion of all state and county taxes as herein provided for ordering the state and county taxes upon property liable to be assessed in towns. The state assessors shall make lists thereof, with as many divisions as will secure equitable taxation, conforming as near as convenient to known divisions and separate·ownership and report the same to each successive legislature."

We note at this point that there is no duty imposed by these statutes upon the Board of State Assessors to determine the acreage of the several tracts of land upon which they fix the valuation for the assessment of state and county taxes; nor can any authority of law be found for such determination. The omission of such acreage from the description of the land taxed in the tax acts does not render the assessment invalid.

The contention that the lands were not lawfully assessed because not lawfully described must be based upon the fact that in the tax acts the Legislature used certain abbreviations in describing some of the tracts of land. This criticism applies to only part of the tracts included in the list. It cannot apply to such descriptions as "No. 9, South Division" in Hancock County, or "Fryeburg Acad. Grant" in Oxford County, or "No. 37 Middle Division" in Washington County.

The contention is aimed at descriptions of which the following are examples: "A. R. 2, W. E. L. S.," or "No. 8, R. 3, W. E. L. S.," in Aroostook County, or "No. 5, R. 9, N.W.P.," in Piscataquis County. This method of describing townships of wild lands in state tax acts has been in use since 1847, and a slightly less abbreviated form was in use since a much earlier date, and we venture to say that no person familiar with the wild lands of the state, or upon studying a map of the state, would fail to understand that the tracts so described, referred to ·"Township A, Range 2, West of the East line of the State," "Township No. 8, Range 3, West of the East line of the State," and "Township No. 5, Range 9, North of the Waldo Patent." *Hodgdon v. Burleigh et als.*, 4 Fed., 111, 117. So generally had these and similar abbreviations come into use that the Legislature gave them formal recognition by Public Laws 1905, Chapter 137, now found in R. S. 1916, Chap. 10, Sec. 42. We are not aware of any case in which these abbreviations standing alone have been held to render the

description fatally imperfect. So far as the language of the court in *Griffin* v. *Creppin*, 60 Maine, 270, and in *Bank* v. *Parsons*, 86 Maine, 514, condemns the use of such abbreviations as insufficient it should be disregarded; the descriptions under consideration in both those cases were otherwise fatally defective. We think that in every case, as in those last cited, where these abbreviations have been used, the designation of a certain number of acres in the township so described, without other location, has been under consideration. Such a description has been many times declared bad. *Moulton* v. *Egery*, supra, and other cases hereinbefore cited.

We hold that the assessments of the state taxes in question were legally made, that the descriptions of the lands taxed were sufficient, and that said lands were "held to the state for payment of such state and county taxes, with interest thereon at the rate of twenty per cent to commence upon the taxes for the year in which such assessment is made at the expiration of one year, and upon the taxes for the following year upon the expiration of two years from the date of such assessment." R. S. 1883, Chap. 6, Sec. 71. This interest of the State continues until the taxes assessed upon the several tracts are paid in full or the State's interest otherwise legally released.

Passing to consideration of the notices of sale, we note that paragraph three of the bill alleges that the advertisement of 1902 offered to sell and convey "all the interest of the state in the tracts of land therein described lying in unincorporated townships, said tracts having been forfeited to the state for state and county taxes, certified to the Treasurer of State for the year 1900;" the answer admits the allegation.

The description of the tracts in the notice follows the description in the tax acts with the addition of a number of acres opposite each description, as for example:

"Aroostook County.

| Year | | Acres. | Tax. |
|------|--------------|--------|---------|
| 1900 | A  R 2 W.E.L.S. | 598 | 10.40" |

"Oxford County

| | | | |
|------|----------------------|------|---------|
| 1900 | Fryeburg Academy Grant | 4510 | 66.20" |

The notice did not offer for sale the State's interest in 598 acres in A R. 2 W.E.L.S., or in 4510 acres in Fryeburg Academy Grant, but

in the tracts therein described following the description in the tax acts. The law under which the sale was made provides that *"lands thus forfeited shall . . . . be sold . . . . Notice of the sale shall be given by publishing a list of the lands to be sold . . ."* R. S. 1883, Chap. 6, Sec. 73. To designate a certain number of unlocated acres as a description of a tract of land seems absurd.

If the number of acres is a part of the description, it must yield to, and cannot control the more comprehensive and definite descriptions of the townships or tracts following the tax acts. The same considerations apply to the notice of 1903.

An examination of the case shows, moreover, that the State's interest under the assessments was not released on any part of any township or tract assessed, involved in this case.

We have already noted that the law provides:—"The state assessors shall make lists thereof, (the lands to be assessed by the legislature) with as many divisions as will secure equitable taxation, conforming as near as convenient to known divisions and separate ownership and report the same to each successive legislature." R. S. 1883, Chap. 6, Sec. 69. It is to be presumed that the State Assessors did their duty. The law also provides:—"Owners of the lands so assessed and advertised may redeem them, by paying to the treasurer of state the taxes with interest thereon, within one year from the time when such interest commences. Each owner may pay for his interest in any tract, whether in common or not, and shall receive a certificate from the treasurer of state, discharging the tax upon the number of acres, or interest, upon which such payment is made." R. S. 1883, Chap. 6, Sec. 72.

It appears from the record that a procedure obtained in the office of the treasurer of state, in construing this provision for redemption of a part of any tract, to permit a person to redeem a specified number of acres without other description; the practice was to take the number of acres in the township as given by the state assessors in their valuation as the basis of computing the tax on a specified portion, and to accept from an owner in severalty such part of the whole tax on the township as the number of acres in the portion owned in severalty bears to the whole acreage of the township as stated by the Board of State Assessors, giving the owner a certificate of payment on the number of acres so owned without further description. This practice explains the acreage as given in the notices opposite the

description of each tract.   We think that this construction of section seventy-two cannot be sustained, or the practice approved.   First, there is no duty imposed upon the state assessors, as we have seen, to fix the acreage in any township or tract as the basis of such computation.   Mr. Wiswell testifies that the "acreage is brought about by the opinions of the different wild land owners."   Second, such construction and practice defeats the purpose of the law to provide means for the discharge of the State's lien or interest upon specified portions owned in severalty.   Third, it may well be contended that such construction is in contravention of the provision of the State Constitution, Article 9, Section 8; "All taxes upon real and personal estate, assessed by the authority of this State, shall be apportioned and assessed equally, according to the just value thereof;" inasmuch as it ignores the relative value of different portions of each township or tract.

It is undoubtedly the purpose of the second sentence above quoted from section seventy-two to provide a procedure whereby an owner of an interest in any tract, whether in common or not, may effectually obtain a release of the State's interest in his holdings.   If he is a tenant in common, he may obtain such release by paying the proportion of the tax represented by his holdings; he would then obtain a certificate discharging the tax upon his one undivided half, or one undivided quarter, or one undivided twelfth, as the case may be; the State's interest would then be effectually released from that fractional interest, and remain upon the rest of the township or tract, and the advertisements should then offer for sale the State's interest, not in one half, three quarters, or eleven twelfths as the case may be, but in one undivided half, or three undivided quarters, or eleven undivided twelfths, because different portions may have different values.   *Larrabee* v. *Hodgkins*, 58 Maine, 412.

If an owner in severalty of a portion of the township or tract taxed wishes to discharge the tax upon his holding, he may, if he sees fit, waiving the inequality in value between his holding and the remainder of the tract, pay the proportion of the tax which his acreage bears to the acreage of the township and tract as stated by the state assessors.   This seems to have been the usual procedure.   But if he takes a certificate discharging the tax upon a certain number of acres without further description, the payment and certificate are ineffectual to release the state's interest upon any part of the tract, and the whole

tract remains held for the balance of the tax. It is clear that such a certificate is insufficient to release the State's interest in any particular parcel, and thereby that interest be restricted to the remaining acreage. Take for example, Fryeburg Academy Grant in Oxford County which was returned by the state assessors as containing 6,500 acres; somebody paid on 1,990 acres and received a certificate discharging the tax on 1,990 acres without further description. The location of the 1,990 acres was not specified, nor could the location of the remaining 4,510 acres be determined. The Treasurer of State can neither determine what was the portion in which the State's interest has been released, nor the portion in which it was retained. The procedure in the treasurer's office was therefore insufficient to release the State's interest in any part of the townships or tracts taxed, and the notices, for this reason, as well as by their own phraseology, must be held to have offered for sale the State's interest in the entire tracts. The owner in severalty could make his payment effective by furnishing a description of his holdings, as he was later required to do by Public Laws 1905, Chap. 69, Sec. 3 and Public Laws 1905, Chap. 150, Sec. 2.

We have said that the owner in severalty may waive the inequality in value between his holding and the remainder of the tract and pay the proportion of the tax based upon acreage. If he does not choose to waive that inequality, it may well be contended as to levies made prior to the passage of Public Laws 1895, Chapter 56, that the construction of the statute and the practice under it, is in contravention of the tax provision of the State Constitution before quoted. The learned Attorney General in his brief for the State says: "During the entire history of this legislation, it was never suggested that the assessment itself was invalid because it was laid upon the entire township, because the owners of the lands were not named, or for any other reason pertinent to this case;" in this he has overlooked certain decisions by eminent judges in the United States District Court for the District of Maine. In *Clarke* v. *Strickland et als.*, 2 Curt., 439 Fed. Cas. No. 2864, (1855) the question was raised by Judge Ware, whether the tax could rightfully be levied upon a whole township, which was owned in severalty by different proprietors *when there was no mode of making a valuation and apportionment provided by law*, so that the tax must be levied on all the different proprietors pro rata, according to the quantity owned by each, without regard to the

relative value of the different lots or holdings. The same question was later (1880) raised by Judge Fox in *Hodgdon* v. *Burleigh et als.,* 4 Fed., 111, who states that Judge Ware's opinion was doubtless concurred in by Judge B. R. Curtis, who reported the earlier case. The question was not passed upon by either court. Nor is the question important here. The Legislature has apparently met the objection by providing the means of making a valuation of each holding, by directing the assessors to make their lists "with as many divisions as will secure equitable taxation, conforming as near as convenient to known divisions and separate ownership." Since the enactment of this provision in Public Laws, 1895, Chapter 56, the owner can at all times protect himself by giving to the state assessors a proper description of his holdings, and thus have them valued separately. Public Laws, 1891, Chap. 103, Sec. 15 as amended by Public Laws 1893, Chap. 291, Sec. 1. (R. S., 1916, Chap. 9, Sec. 9).

The treasurer of state can protect both State and land owners, and make his tax sales effective to pass title to the State's interest in specific townships and tracts by following the divisions given in the tax acts and by requiring a description of his holdings from the owner in severalty desiring to pay a part of the tax. The question raised in *Clarke* v. *Strickland et als.* and in *Hodgdon* v. *Burleigh et als.* is only of importance in the instant case as bearing on the practice of the treasury officials, and we have held that that practice cannot be sustained for other reasons. The language quoted by the Attorney General from the opinion in *Adams* v. *Larrabee,* 46 Maine, 416: "If the assessment had been on the whole township, in solido, designating the number and range, it would have been good. In such case each owner could have computed the amount due from him for his part,—" was not necessary to the decision of the case, and is so treated in the head note.

We hold, therefore, that the lands were sufficiently described in both assessment and notice of sale, and that the latter offered for sale the State's interest in the several tracts as described in the tax acts.

The third reason given for maintaining that the advertisements of the State were constructively fraudulent,—that lands were described which did not exist—is not sustained by the record. This result follows from our conclusion that the number of acres stated in the notice is not controlling. The number of acres may not have existed; but the lands as described in the tax acts did exist.

Counsel for the plaintiff finally contends that there had been no forfeiture whatever as advertised. "No lands, no interests were forfeited," they contend.

This contention is evidently based upon a misconception of a part of R. S. 1883, Chap. 6, Secs. 71 and 72; the former section provides,— "When the legislature assesses such state tax, the treasurer of state shall within three months thereafter, cause the lists of such assessments, with the lists of any county tax so certified to him, both for the current year, to be advertised for three weeks successively in the state paper, and in some newspaper, if any, printed in the county in which the land lies, and shall cause like advertisement of the lists of such state and county taxes for the following year to be made within three months after one year from such assessment;" interest is "to commence upon the taxes for the year in which such assessment is made at the expiration of one year and upon the taxes for the following year upon the expiration of two years from the date of such assessment."

Section 72 provides,—"Owners of the lands so assessed and advertised, may redeem them, by paying to the treasurer of state the taxes with interest thereon, within one year from the time when such interest commences. . . . . Each part or interest of every such township or tract, upon which the state or county taxes so advertised are not paid with interest within the time limited in this section for such redemption, shall be wholly forfeited to the state, and vest therein free of any claims by any former owner."

Section 75 provides: "Any owner may redeem his interest in such lands, by paying to the treasurer of state his part of the sums due at any time before sale; or after sale, by paying or tendering to the purchaser, within a year, his proportion of what the purchaser paid therefor at the sale, with interest at the rate of twenty per cent a year from the time of sale, and one dollar for a release; and the purchaser, on reasonable demand, shall execute such release; . . . . Or such owner may redeem his interest by paying as aforesaid to the treasurer of state, who, on payment of fifty cents, shall give a certificate thereof; which certificate recorded in the registry of deeds in the county or district where the lands lie, shall be a release of such interest, and the title thereto shall revert and be held as if no such sale had been made."

Without examining in detail the various statutes passed upon the subject from R. S., 1841, Chap. 14, Secs. 1-9 to the form in which they are found in R. S. 1883, Chap. 6, Secs. 69-75, we think it must be considered settled that the state, in view of all the statutory requirements and especially the provisions for redemption within one year after sale, has but a lien upon the land. Such was the opinion of Chief Justice Peters expressed in *Chandler* v. *Wilson*, 77 Maine, 76, 82. "In such case the state has the land not to keep—not to use—but to sell for the taxes. The state in view of all statutory requirements, has but a lien upon the land." Mr. Justice EMERY after an exhaustive review of the statutes and authorities in *Millett* v. *Mullen*, 95 Maine, 400, 417, considered the question no longer open. It is undoubtedly advisable that the last part of Section 72 above quoted (R. S., 1916, Chap. 10, Sec. 45) should be so changed in the next revision as to conform more accurately to the accepted construction of the law. The plaintiff's position, however, on the point now under consideration cannot be sustained. Moreover, the statement in the notice of sale that the tracts of land have "been forfeited to the state" is not a representation on which the grantee has the right to rely. *Pennock* v. *Douglass Co.*, 39 Neb., 293; 42 Am. St. Rep. 579, at Page 585.

We hold, therefore, that the contention of plaintiff's counsel that the notice of sale was constructively fraudulent cannot be maintained; that the rule of "caveat emptor" applies to sales of the character here under consideration; and that the plaintiff in making his bids for the State's interest in the several tracts of land sold assumed all risk of failure of title through informality or illegality in the assessments, in the proceedings of the county commissioners as to county taxes, and through defective notices, or defective proceedings in offering the various items for sale. He had full opportunity to examine the antecedent proceedings and to determine their validity. We have no occasion, therefore, to determine the validity of sales on September 24, 1902 of the State's interest in lands not certified to the treasurer of State for the year 1900; for example, Township 17, Range 8, West of the East line of the State, known as St. John Plantation, in Aroostook County, which is listed fourteen times for taxes in arrears for the years 1881 to 1894 inclusive; or Township 16, Range 7, West of the East line of the State, known as Eagle Lake Plantation, in Aroostook County, which is also listed

fourteen times for taxes in arrears for the years 1881 to 1894 inclusive.

Nor have we to consider whether the procedure at the sale was correct in offering for sale the state's interest in the same township several times at the same sale: for example, Fryeburg Academy Grant in Oxford County was listed sixteen times for taxes in arrears for the years 1885 to 1900 both inclusive, and the State's interest was offered for sale, and was sold, sixteen times, and sixteen deeds were given, one for each year. Was this practice correct, or should the State's interest in Fryeburg Academy Grant have been offered and sold once for a minimum price of all the taxes then in arrears thereon, interest and cost of sale? R. S. 1883, Chap. 6, Sec. 73.

These questions which arise many times in the proceedings for the years here under consideration, are all within the rule which we hold applicable to such sales. The plaintiff in bidding assumed all chances of invalidity of the sale from any of these causes.

The resolve under which we are considering this case, declares in its opening clauses, as noted at the beginning of this opinion, that the plaintiff received no consideration for the sums which he paid to the state, and that fact is the basis of the grant of authority to institute these proceedings.

The learned Attorney General challenges the correctness of this statement of the resolve and maintains that the plaintiff did "acquire by virtue of the proceedings in question rights of great practical and pecuniary value, and that it is his own fault that they were allowed to become worthless."

First, he argues that the plaintiff's deeds, if recorded, would have constituted a cloud upon the title to the real estate, and that the land owner would be compelled to pay the tax, to obtain the removal of the cloud. But this court has held that a tax deed containing a description precisely like the description contained in every deed which the plaintiff received, is insufficient to create any doubt or cast any cloud upon the owner's title, since a mere inspection shows upon its face that it conveys no title. *Powers* v. *Sawyer*, 100 Maine, 536, 542.

"Further," the Attorney General argues, "regardless of the legal or equitable situation, it is apparent that plaintiff had paid taxes assessed against the property of other persons which properly belonged to the owners to pay, and had he been diligent in attempting to secure

reimbursement from those who had benefited by his action, it can hardly be doubted as a practical matter that he would have succeeded in recouping a large portion of his loss." The answer to this argument is the same as before, that the deeds upon inspection disclose that they convey no title, and therefore are valueless as a basis for demanding reimbursement. He further argues that the transaction was speculative; that the plaintiff stood to make large profits; that is true; but the transaction is directly authorized by the law of this State and is the foundation of our system of enforcing payment of taxes in arrears. As long as the State sanctions and approves it, and encourages bidders, the practice of buying state tax titles is not justly open to criticism. We, however, hold the buyer to full responsibility under the rule of "caveat emptor;" he assumes all chances of any imperfections or irregularities existing up to the time the property is struck off to him, and he is entitled to a deed of what he bought.

The answer to the Attorney General's argument upon the question of failure of consideration, and the justification of the legislative declaration that the plaintiff received no consideration for the sums which he paid to the State, is found in the fact that in not a single instance did Keyes receive the deed to which he was entitled as the successful bidder at the sale. We have seen that the Legislature regularly assessed these lands, that thereby the lands became held to the State for the payment of the taxes assessed, that no part of the State's interest had been released, that the State's interest in said lands was advertised for sale, and that the plaintiff was the successful bidder; the case shows that the deeds for the 1902 purchase were sent the plaintiff by express on October 15, about three weeks after the sale, and for the 1903 purchase the deeds were sent to him October 2. Had these deeds purported to convey the State's interest in the townships or tracts of land assessed, and not in a certain number of unlocated acres in each of those townships or tracts, the plaintiff would have received deeds of what he purchased; and if perchance the title had proved defective for any reason, the plaintiff would have had no recourse to the State; he would have received a deed of what he bought, and there would not have been a failure of consideration. *Abbott* v. *Chase*, 75 Maine, 83, 87. For example, the Treasurer of State advertised the state's interest in Fryeburg Academy Grant, 4510 acres, in Oxford County, also Township 8, Range 5, W.E.L.S. 1192 acres, in Aroostook County, also Township 9, South Division,

6060 acres in Hancock County; the plaintiff was the successful bidder therefor; he did not receive deeds of the State's interest in the tracts of land as advertised, but deeds, worthless upon their face, of the State's interest in 4510 acres in Fryeburg Academy Grant, the State's interest in 1192 acres in 8, Range 5, W.E.L.S., the State's interest in 6060 acres in 9, South Division. Had the plaintiff received deeds of what he bought, he would have had no cause of complaint, however fatally defective his titles might prove; he would have received a deed of the State's interest in a described tract of land, not of the State's interest in an unlocated number of acres. As it is, the State has received and holds his money, and has given him deeds worthless upon their face, in place of those to which he was entitled. This we think, fully supports the statement of the resolve that the plaintiff received no consideration for the money paid by him.

Does this situation present a state of facts which entitles the plaintiff to recover the consideration paid? We think that this question must be answered in the affirmative.

The State entered into a contract with the plaintiff to convey to him for a specified consideration all the interest in certain lands that it had a right to convey. In drafting the deeds a mistake was made; the plaintiff did not receive conveyances of the interest of the State which he had purchased, but worthless instruments in form of deeds. The plaintiff paid his money and the State has kept it. The State, it may be said, has never refused to convey the interest which it agreed to convey; but it has unreasonably failed and neglected to do it. After the plaintiff paid the consideration, it was for the State to act; the State was bound to give him good deeds, that is, deeds that would have conveyed all the interest which the State had the right to convey. It has allowed nearly twenty years to pass without doing this, notwithstanding the matter has been biennially before the Legislature. We think that this is an unreasonable delay. Under the same circumstances one private individual would be entitled to recover against another. *Pancoast* v. *Dinsmore*, 105 Maine, 471. Under the legislative resolve the State has consented to be sued waiving its immunity. For the purposes of this case it is to be treated as any other suitor, corporate or individual. The plaintiff, therefore, should recover in this case.

We think that the State cannot, under the circumstances disclosed by this case, in good conscience retain the money which the plaintiff

paid into the State Treasury, for which the Legislature has declared by the resolve of March 27, 1919, that he received no consideration; and that judgment should be rendered in his behalf for the sum of seventeen thousand, eight hundred ninety dollars and twenty-four cents ($17,890.24) with interest thereon from September 24, 1902, and for the further sum of four hundred fifty-five dollars and ninety-nine cents ($455.99) with interest thereon from September 24, 1903.

We think that he is not entitled to recover the sum of $316 which was exacted without authority of law and did not come into the State Treasury; the State is not liable therefor. Nor is the plaintiff entitled to receive his expenses in endeavors to obtain repayment of his money. *Joy* v. *County of Oxford,* 3 Maine, 131, 135.

The Chief Justice and Justices PHILBROOK and WILSON, having been of counsel, take no part in this decision.

The bill is sustained with costs, and a decree may be entered in accordance with this opinion.

*So ordered.*